501

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA    .    Criminal No. 1:16cr43-3, -4
                    .
    vs.             .    Alexandria, Virginia
                    .    October 26, 2016
SANCHITA BHATTACHARYA and  .    9:30 a.m.
VIKRANT JHARIA,         .
                    .
         Defendants.   .
                    .
.  .  .  .  .  .  .  .  .  .

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

VOLUME III

APPEARANCES:

FOR THE GOVERNMENT:        ROBERT WIECHERING, AUSA
                        JULIA MARTINEZ, AUSA
                        PAUL K. NITZE, SAUSA
                        ANGELA M. FIORENTINO-RIOS, SAUSA
                        United States Attorney's Office
                        2100 Jamieson Avenue
                        Alexandria, VA 22314

FOR DEFENDANT BHATTACHARYA:  ANDREW M. STEWART, ESQ.
                        Dennis & Stewart PLLC
                        2045 North 15th Street
                        Arlington, VA 22201

FOR DEFENDANT JHARIA:      JONATHAN A. SIMMS, ESQ.
                        MELANIE C. WRIGHT, ESQ.
                        The Simms Firm PLC
                        10560 Main Street, Suite 510
                        Fairfax, VA 22030

(Pages 501 - 549)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

502

1    APPEARANCES:   (Cont'd.)

2    ALSO PRESENT:                    SA MATTHEW GRIMM
                                      PAULETTE REYES
3                                     KEELEY SANDVIG

4

     OFFICIAL COURT REPORTER:        ANNELIESE J. THOMSON, RDR, CRR
5                                    U.S. District Court, Fifth Floor
                                     401 Courthouse Square
6                                    Alexandria, VA 22314
                                     (703)299-8595
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

503

```
 1              P R O C E E D I N G S

 2                   (Defendants present, Jury out.)

 3         THE CLERK:  Criminal Case 16-43, United States of

 4  America v. Sanchita Bhattacharya and Vikrant Jharia.  Would

 5  counsel please note their appearances for the record.

 6         MR. NITZE:  Good morning, Your Honor.  Paul Nitze and

 7  Angela Fiorentino-Rios for the United States.

 8         THE COURT:  Good morning.

 9         MR. STEWART:  Good morning, Your Honor.  Andrew

10  Stewart on behalf of Ms. Bhattacharya.

11         THE COURT:  All right.

12         MR. SIMMS:  Good morning, Your Honor.  Jonathan Simms

13  on behalf of Vikrant Jharia.  Your Honor, this morning I'm also

14  joined by Melanie Wright.  She will be assisting me with some

15  of my exhibits.

16         THE COURT:  All right, good morning.

17         And both defendants are here.  Any preliminary

18  matters before we bring the jury in?

19         MR. STEWART:  Your Honor, yes.  As we addressed

20  yesterday, there was some additional materials that were

21  prepared relating to interviews that had been conducted with

22  Ms. Narang.  Upon reviewing those interviews, we believe that

23  there are *Brady* violations that have occurred.  After receiving

24  those -- the notes from those interviews in court, we

25  subsequently received two additional batches of documents from
```

504

1    the government.

2          THE COURT:  When you say batches, what kind of

3    quantity are you talking about?  Just give me -- fifty pages?

4    What is that?

5          MR. STEWART:  I would say 2 inches.

6          THE COURT:  Yeah, that looks like an inch and a half

7    to 2 inches.

8          MR. STEWART:  The government --

9          THE COURT:  What kind of documents are they?

10          MR. STEWART:  ROIs, notes from prior witness

11   interviews.  Some of the witnesses were, were called or are

12   going to be called as witnesses to testify.  Some are witnesses

13   that are not going to be called to testify by the government.

14   And quite frankly, I haven't had a chance to review it all

15   even.

16          THE COURT:  What do you say, though, from what you've

17   seen would be *Brady*?

18          MR. STEWART:  Well, there are, I guess, a number of

19   issues.  There is offers of immunity that were provided to both

20   Narang and Kaur, K-a-u-r or K-u-a-r.

21          THE COURT:  K-a-u-r.

22          MR. STEWART:  Those are indicated in the notes and --

23          THE COURT:  Well, that's clear *Giglio*, and it should

24   have been turned over before now.

25          MR. STEWART:  It hasn't been.

505

1          THE COURT:  And you were never advised before last

2    night that they'd been offered immunity?  Now, there's immunity

3    statements in their plea agreements.

4          MR. STEWART:  That's correct, but we hadn't received

5    the -- we hadn't been provided with a letter, and there hadn't

6    been any specific representation that interviews were conducted

7    with a proffer letter in place.

8          Now, common practice in this jurisdiction is that an

9    attorney usually wouldn't put their client in front of

10   government agents and the prosecutor without there being a

11   proffer letter in place, but nevertheless, they weren't

12   provided to us.

13         Kaur's proffer letter was provided to us yesterday,

14   but again, that's clearly during the trial proceedings.

15         In addition to that, there are certain impeachment

16   statements that we would be relying on, specifically, that

17   during this first proffer session with Ms. Narang, she made a

18   number of misrepresentations to the agents.  It appears from

19   the notes that the interview was stopped and counsel had a

20   conversation with Ms. Narang for approximately a half-hour.  At

21   the conclusion of that interview, she admitted that she lied.

22         THE COURT:  Well, you'll be able to use that when you

23   cross-examine her.

24         MR. STEWART:  Well, I think that the, the concern is

25   in a *Brady* context that this is being provided to us now,

1   during trial, so it's in violation of the order that all the

2   parties signed, but more than that, it gets to the heart of

3   what the concern with *Brady* and its progeny is, and that is,

4   that counsel be afforded the opportunity to adequately prepare

5   for trial in order to avoid due process violations.

6          And in looking at -- and those are just two of the

7   examples that immediately jump to mind but are certainly the

8   most serious.  There are also --

9          THE COURT:  Hold on one second.

10         Because this jury came in on time, would you please

11  let them know there's some logistical issues that I'm

12  addressing with counsel, and so there's going to be another

13  five or ten minutes before we can bring them in?

14         THE COURT SECURITY OFFICER:  Yes, ma'am.

15         THE COURT:  All right, thank you.

16         All right, go ahead.

17         MR. STEWART:  Now, the problem is that in this -- in

18  affecting our ability to effectively prepare for trial, we've

19  been able -- my cursory review of the documents that I was

20  provided in court yesterday, basically notes from four

21  interviews, been able to identify inconsistencies in

22  Ms. Narang's testimony beyond just the initial lie and the lack

23  of the proffer letters being provided, and so because of the

24  volume of the discovery in this case, in order to go back and

25  prepare an effective defense in order to address some of these

507

1    inconsistencies is going to require going back into the

2    discovery and looking at e-mail communication, and

3    specifically, it's going to change the types of searches that I

4    would have to be doing.

5              So rather than focusing on -- well, now that I've

6    identified an inconsistency between Kaur's statements and

7    Narang's statement, now I can specifically go back and look at

8    communication and look for specific types of communication

9    between those two.  I wasn't able to do that until last night.

10             THE COURT:  All right.  Do you have easily available

11   for me to take a look at the notes indicating that she admits

12   that she lied?

13             MR. STEWART:  I do, Your Honor.  And I apologize, I

14   don't have a clean copy.

15             THE COURT:  That's all right.  Just let me take a

16   quick look at it.

17             MR. STEWART:  With the assistance of the courtroom

18   security officer?

19             And so if you flip to the last page, that's what I'll

20   note.  Well, actually, as long as you have the document in

21   front of you, if you look at the upper right-hand side, I've

22   circled a statement that's in quotes.  So I'm -- my opinion

23   would be that that even would qualify as *Jencks*.

24             THE COURT:  Hold on just one second.

25             Is that your handwriting in the blue ink in the left

508

1    corner?

2            MR. STEWART:  Yes, ma'am.  There are circles -- yeah,

3    there are circles and, I guess, other notations, but everything

4    that's in blue is my work product.

5            THE COURT:  Well, where do you indicate -- where do

6    you say it shows on here that it was stopped and she admitted

7    she was lying?

8            MR. STEWART:  Well, there's a circle, and it's kind

9    of parsed out, and then you see the time stop and then the time

10   start again.

11           MR. SIMMS:  The last page.

12           THE COURT:  Okay.  Hold on.

13           MR. SIMMS:  Page 4.

14           MR. STEWART:  So you see "Break 12:30," and then

15   there's that little circle, "Showed e-mail about Climetrix

16   addition to resume to Sushma Patel.  She denied."  And I'm not

17   sure what that means.

18           And then so there's basically a 40-minute break.  It

19   starts back up again, and there's a line from 1:10 p.m., "She

20   acknowledges that the e-mail/resume she just lied about was a

21   lie."  And then immediately after that, "Agrees to plead

22   guilty."

23           THE COURT:  And the agent that took these notes is,

24   what, Agent Grimm?

25           MR. STEWART:  That's my understanding.

509

```
 1            THE COURT:  And Mr. Nitze was present during that
 2  interview?
 3            MR. STEWART:  Mr. Nitze and there's a name in the
 4  middle, but I'm not sure who that is.
 5            THE COURT:  It looks like Joan.  Is there anybody
 6  like that working on this case?  Mr. Nitze, do you know who
 7  else was there at that meeting with you and Mr. Grimm?
 8            MR. NITZE:  Kipling Doan, Your Honor, and --
 9            THE COURT:  Who is that?
10            MR. NITZE:  He's an agent from the Department of
11  Homeland Security, ICE.
12            THE COURT:  All right.
13            MR. NITZE:  And also John Kiyonaga.
14            THE COURT:  All right, who took these notes?  I mean,
15  whose handwriting is this?
16            MR. NITZE:  This is Matthew Grimm's handwriting.
17            THE COURT:  Well, you can certainly put the agent on
18  the stand, and he'll have to say that she admitted lying during
19  the debriefing.  That certainly will help you on the --
20            MR. STEWART:  I think one of the other issues that
21  we're having, Your Honor, also relates to the testimony that
22  has already been elicited, and there are references made to
23  statements that are already -- or references made to documents
24  that have been admitted in this trial, and there are statements
25  that Ms. Narang made during the October 11 debriefing where she
```

510

1    says that she can't be sure about a signature, and now at

2    trial, she testifies that she was sure.

3         THE COURT:  All right.  Well, look, here's what we're

4    going to do.  We're going to get this testimony in.  I can tell

5    you that several jurors complained to my CSO, as I expected

6    they would, that they couldn't hear either the prosecutor or

7    Ms. Narang yesterday.  Both were speaking too softly.  So I

8    suspect they've missed a good portion of her testimony anyway.

9    The case, in my view, is going in in a very dense and difficult

10   manner, and that is, frankly, in your favor at this point.

11        We're going to let this direct testimony go in.  Then

12   I am going to allow you time to cross her.  We'll take the next

13   witness, Kaur or whoever else they're going to call, and if you

14   need more time for Kaur as well, we'll see whether -- we're

15   going to see when the government finishes its case, all right?

16        MR. STEWART:  Your Honor --

17        THE COURT:  And then I will give you some kind of a

18   brief break.  I don't know how long -- again, we have a jury of

19   14 citizens whose time I don't want to waste, but this should

20   not have happened.  Certainly when a prosecutor has any

21   evidence that a witness who you're relying upon has lied, has

22   admitted lying, that is clear *Brady*, and that should have been

23   turned over in advance.  There is no excuse why that wasn't

24   brought to the attention of defense counsel.

25        MR. STEWART:  Your Honor, if I may just make a

511

1   record?  The -- and this is one of the, I guess, as evidence of

2   our lack of preparation, Mr. Simms and I are --

3            THE COURT:  Well, it's not your lack of preparation.

4   You're both well-prepared attorneys.  It's the frustration in

5   being able to be fully prepared because the government hasn't

6   fulfilled its obligations to provide you the information, all

7   right?

8            MR. STEWART:  Let me put a pin on what my argument is

9   then, Your Honor, just in the interests of time.  At this

10  point, we're moving for dismissal, and we're moving for

11  dismissal with prejudice based on the, both the *Brady* violation

12  and what we would argue are also *Giglio* and *Jencks* violations,

13  but more importantly, dismissal in this case would be, it would

14  be appropriate, and the Court has the authority to grant a

15  dismissal in a case such as this and under circumstances such

16  as this not only because of the violations but also for a

17  punitive effect on the government.

18            And it's important because there's a discovery order

19  that's been clearly violated in this case, and -- what did I

20  just do with your copy that you handed me?  Oh.

21            And the case law under *Brady* is clear that when the

22  prosecution has violated *Brady* by not disclosing favorable

23  witness statements until -- and this is a D.C. Circuit case;

24  that's what I could find -- until two weeks before trial, but

25  that statement -- sorry, I'm reading the wrong part even.

512

1              Late disclosure *Brady* material that deprived the

2    defendant of an opportunity to interview favorable witnesses

3    and conduct additional pretrial investigation in aid of his

4    defense based upon those interviews all go to this overarching

5    *Brady* concern that exculpatory evidence must be disclosed in

6    time for defense to be able to use it effectively not only in

7    the presentation of the case but also in its trial preparation.

8              It's the preparation that is affecting my client's

9    and Mr. Simms' client's due process in this case.  So we got

10   our *Jencks* timely.  That's an issue that the Court's addressed.

11   We've gotten additional documents last night, and the

12   cumulative effect of all of this is that I stand before this

13   Court having not reviewed documents that I've been provided and

14   not able to completely prepare to cross Ms. Narang, and I know

15   that there are, there are significant issues that I need to be

16   able to cross her on.

17             THE COURT:  All right, Mr. Stewart, among the 2

18   inches of documents you've gotten, are those all notes, or are

19   there some e-mails?

20             MR. STEWART:  There's notes.  There's ROIs.

21             THE COURT:  There are ROIs?

22             MR. STEWART:  There's ROIs.  Some -- I don't know

23   that I'm the most accurate person to tell you what is in that

24   because I haven't looked at all of it.  I haven't even put eyes

25   on all of it, Your Honor, and that's what's frustrating.

513

```
 1              THE COURT:  Let me see the whole package.
 2              MR. STEWART:  With the assistance of the courtroom
 3    security officer, I'll pass it forward.
 4              THE COURT:  I'm just going to go through it very,
 5    very quickly.
 6              MR. STEWART:  There's not even work product in any of
 7    this.  I haven't even circled things that are of interest to
 8    me.
 9              THE COURT:  All right.  Now, the first thing you're
10    showing me is an ROI of an interview of Devin Wright, and Devin
11    Wright was the second-in-command in Danville, right, or the top
12    person in Danville?
13              No?  Who was Devin Wright?  We've heard the name
14    "Wright" mentioned before.
15              MR. STEWART:  I don't know, Your Honor.  I don't --
16    so again --
17              THE COURT:  But this is a report of investigation, I
18    mean, right on the top, and this is some -- and this was never
19    turned over to you before?
20              MR. STEWART:  No, Your Honor.  Well, which batch is
21    that in?  That was provided to us, I think, around midnight.
22              And, Your Honor, just for the Court's reference,
23    that -- what you have in front of you does not include the four
24    proffers that were done with Ms. Narang.  Those are the
25    documents I had time to review.
```

514

1          THE COURT:  Well, the proffers, I'm not sure.  Those

2   are, what, the defense attorney's representation as to what his

3   client might say?

4          MR. STEWART:  No, no.  I'm sorry, I misspoke.

5   Debriefings.  One is, one is described as a proffer session by

6   the agent.  They're all described as proffer sessions by the

7   agent, but it's not Mr. Kiyonaga making a proffer on behalf of

8   his client.  It's actual interview.

9          THE COURT:  I mean, just for the record, the notes --

10  the four-page document I looked at, those notes are almost --

11  the reason why notes usually are not considered *Jencks*, okay,

12  is because they're usually very cryptic.  They are the writer's

13  representation of what the writer hears the person saying, all

14  right?

15         So I don't think that, for instance, that four-page

16  set of notes would really qualify as *Jencks*, and the law says

17  it's not *Jencks*, but, but the fact that there's a statement in

18  there which Agent Grimm himself wrote that she admits lying,

19  that's clear *Brady*.  I mean, that's a key government witness,

20  and it's evidence that she has lied.  That's usable for

21  significant impeachment, and therefore, that should have been

22  turned over.  There's no excuse for that.  That's not *Jencks*;

23  that's *Brady*, okay?

24         MR. STEWART:  Absolutely.

25         THE COURT:  But I will tell you, the first bunch of

515

1    these reports of investigation I've looked through would not

2    appear to have any real value to you.  It's, you know, it is

3    certainly stuff that was done, but it's not very useful.

4              MR. STEWART:  Perhaps look at the batch of documents

5    that has the clip on it.

6              THE COURT:  All right.  So anyway, just for the

7    record, there are a significant number of reports of

8    investigation that apparently you didn't get, and then there --

9    you know, synopses themselves, you know, wouldn't be

10   admissible, but as you said, they could lead you to things, all

11   right.

12             Now, the things you've clipped are notes from the

13   various agents?

14             MR. STEWART:  Your Honor, generally speaking, yes.

15   Again, I am not able to speak with any specificity because I

16   have not put eyes on the vast majority of those documents.  I

17   have seen the one on the top.

18             THE COURT:  All right.  Now, Kaur has pled guilty or

19   not pled guilty?  Kaur was not charged; is that right?

20             MR. NITZE:  That's correct, Your Honor.

21             THE COURT:  All right.  Were defense counsel told

22   before last night that Kaur had been offered immunity?

23             MR. NITZE:  Yes, Your Honor.  Yes, Your Honor, they

24   were.

25             THE COURT:  All right.  Is that correct?

516

1          MR. SIMMS:  Yesterday morning.

2          MR. NITZE:  I received -- defense counsel were

3   provided a letter, a Queen for a Day letter from Ms. Kaur prior

4   to yesterday morning.

5          THE COURT:  Well, I'm sorry, when were they provided

6   with information that Kaur had been offered immunity?

7          MR. NITZE:  They were provided information that Kaur

8   had been offered immunity yesterday morning, when I received

9   her trial immunity letter from her attorney, and I immediately

10  turned it over to defense counsel.  Prior to that, I had shared

11  by e-mail a proffer letter for Ms. Kaur with defense counsel.

12         THE COURT:  Well, the note I'm looking at has the

13  date of October 19 on it, and in that, it says, "On immunity

14  letter, corrections, change, strike out derivative, info would

15  not be used against Ravi during this proffer."

16         MR. NITZE:  That's --

17         THE COURT:  You didn't advise counsel around the 19th

18  of October that Kaur was going to be given -- or you were

19  working on giving her immunity?

20         MR. NITZE:  Your Honor -- my best recollection, Your

21  Honor, is that I e-mailed counsel a copy of her immunity

22  letter, I'm not sure if it was on the 19th or immediately

23  thereafter.  It was prior to providing them the trial immunity

24  letter yesterday.

25         THE COURT:  Mr. Stewart?

517

1          MR. STEWART:  Your Honor, in the course of

2    preparation, I was -- I was printing everything that I was

3    receiving.  I was forwarding every e-mail I received from the

4    government the days immediately follow prior to the October 20

5    hearing and subsequently.  The reason for that is that, again,

6    I wasn't even having to -- I didn't even have time to open all

7    of these attachments, so I would forward it to my paralegal,

8    who would print everything, and I would receive confirmation

9    that it was printed.

10          My recollection is that we didn't receive an immunity

11    letter for Ms. Kaur.

12          THE COURT:  All right, Mr. Simms?

13          MR. SIMMS:  Your Honor, it's my same recollection,

14    that we did not receive it.  And I also -- once the Court is

15    ready, I also have representations to make, because I believe

16    what I found last night, I stayed up until about three in the

17    morning going through -- I still didn't get through all of

18    it -- I found several violations of *Brady* in information that I

19    received.

20          MR. STEWART:  And, Your Honor, this notion that

21    informing us --

22          THE COURT:  All right, I'm sending the jury home for

23    today.  Let's bring them in.

24                    (Jury present.)

25          THE COURT:  Good morning, ladies and gentlemen.  I'm

1  very sorry that we had to keep you sort of just cooling your

2  heels in the jury room, and I'm even more sorry that I have to

3  tell you that I'm going to need to send you home for today.

4  It's a gorgeous day, so maybe some of you can get your leaves

5  raked before the machines come to pick them up or go back to

6  work.

7         We have -- sometimes in complex -- you-all have a

8  seat.  Sometimes in complex cases, there are logistical issues

9  that we have that just interrupt proceedings, and we've had one

10  or two of those arise here, and rather than have you waste your

11  time sitting in that room while we try to sort some things out,

12  it would be better for you-all just to go home.

13         Now, what I would like you to do, because I do not

14  like to waste jurors' time, is make sure, if you would very

15  clearly write your name and your best contact number on a slip

16  of paper, maybe one of you pull out a page from your notebook

17  so that we can contact you.

18         Assume that you need to be back here at 9:30

19  tomorrow, all right?  If for any reason we have to change that

20  schedule, I want to be able to be sure that my courtroom

21  deputy, Ms. Guyton, can contact you, because I wouldn't want

22  you coming here and again have another one of these delays, all

23  right?  But I very much appreciate the fact that you have been

24  so diligent as jurors getting here on time every day, and we do

25  appreciate that, but as I said, I don't want to waste your time

1   today.

2          So just make sure that you clearly leave in the jury

3   room a list with your names, please print carefully so we can

4   read them, and whether it's a cell phone or a landline phone, a

5   way we can contact you.  But unless you hear from us, please be

6   here at 9:30 tomorrow morning, and continue to follow my

7   instructions.

8          Thank you.  We'll stay in session.

9          Yes, ma'am?

10          Counsel, you can stay there.

11          (Bench conference on the record.)

12          THE COURT:  Yes, ma'am?

13          JUROR GHANDCHILAR:  If this continues to Tuesday and

14   Wednesday, I have paid classes, mandatory, that I have to make,

15   and I will not make.

16          THE COURT:  What is your name?

17          JUROR GHANDCHILAR:  Ghandchilar --

18          THE COURT:  Ms. Gonzalez?  What is your last name?

19          JUROR GHANDCHILAR:  Ghandchilar,

20   G-h-a-n-d-c-h-i-l-a-r.

21          THE COURT:  So you're all right through Monday?

22          JUROR GHANDCHILAR:  I can come until Monday.

23          THE COURT:  That's fine.

24          (End of bench conference.)

25          THE COURT:  All right, folks, you may go from the

520

1    court.  Thank you.

2                          (Jury out.)

3              THE COURT:  All right, just -- you-all have a seat.

4    Just so you know, that was Juror No. 18, Ms. Ghandchilar,

5    advising the Court that she has prepaid, nonrefundable tuition

6    for classes Tuesday and Wednesday, so if this case goes past

7    Monday, that juror will be unable to sit.  All right.

8              Now, let's -- I was looking at these notes, so -- all

9    right.  So anyway, the second set of notes I'm looking at --

10             MR. STEWART:  Your Honor, we were --

11             THE COURT:  Yeah.

12             MR. STEWART:  We were discussing the providing of the

13   proffer or Queen for a Day letter, whatever -- in essence, the

14   offer of immunity, which would also be *Brady*, and there may

15   have been an ROI that was provided that referenced the proffer

16   letter, I can't speak to that, but there is this notion that's

17   discussed in the case law about open file and how -- let me

18   just find the reference.

19             If I'm reading my notes right, *Strickler* actually

20   addresses this and says open file doesn't relieve the

21   obligation of the government to turn over *Brady* material, and

22   so this would be a situation where even though it may have

23   existed, we could have assumed that it existed, we may have

24   been informed of it through some ROI, that doesn't relieve

25   their obligation to provide us the actual document.

521

1          And if my recollection serves, there were -- and as

2    Your Honor referenced, there were notations made and changes

3    made to those actual documents, so those would be important for

4    counsel to see, notwithstanding the fact that an offer of

5    immunity is clearly *Brady*.

6          THE COURT:  All right, give me another minute.

7          MR. STEWART:  Yes, ma'am.

8          THE COURT:  Did you get ROIs on Ray (sic) Kosuri?

9    Did you get any of Kosuri's debriefing statements?

10         MR. STEWART:  Yes, Your Honor.

11         THE COURT:  Printed?

12         MR. STEWART:  Yes.  I haven't -- I believe we

13   received all of them.  I haven't cross-referenced them with

14   what was provided.

15         MR. SIMMS:  Your Honor, we got one ROI from

16   Mr. Kosuri initially, and then last night, we received several

17   more ROIs from Mr. Kosuri.

18         THE COURT:  And those were not duplicates of previous

19   ones?

20         MR. SIMMS:  And, Your Honor, and I know you're still

21   reviewing the information --

22         THE COURT:  Yeah.

23         MR. SIMMS:  -- but whenever you're ready, I can --

24         THE COURT:  Just give me one second here.

25         MR. SIMMS:  Okay.

522

1          MR. STEWART:  As far as Kosuri was concerned, there

2    were ROIs that were provided periodically, but again, my

3    concern is that we haven't had time to cross-reference what

4    we've received and what we were given last night.

5          THE COURT:  Hold on a second.

6          It is interesting that within these documents are

7    apparently the direct scripts, with answers, for several of the

8    witnesses.  The first two I looked at, I don't see any

9    inconsistencies of what they said in court; however, I've never

10   quite seen this before, where the answer is included in the

11   script.

12         MR. STEWART:  My recollection would be that that

13   would also fall --

14         THE COURT:  I think that probably would have been.

15   It's classic *Jencks*.  I don't think there's anything *Brady* here

16   other than a defense attorney might have had some fun showing

17   to the witness and said, "Is this the script that you were

18   given or that you agreed to?"

19         MR. STEWART:  Well, that's one of the concerns, Your

20   Honor.  In looking at this stuff, there's a confluence -- well,

21   that's -- as a defense counsel, sometimes I -- and that may be

22   a minimization -- conflate *Brady*, *Jencks*, and *Giglio*, and so it

23   takes a minute, more than a minute, it took most of last night

24   to try and look at these documents and figure out what category

25   they fall into in order to try and prepare some sort of

523

1    coherent argument, whether it be off the cuff or not.

2              THE COURT:  All right.  All right, Mr. Simms, you

3    said you were going to put on the record what you think is

4    other *Brady* material that was not turned over?

5              MR. SIMMS:  Yes, Your Honor.

6              THE COURT:  Within this package or something else?

7              MR. SIMMS:  It actually was turned over as part of

8    *Jencks*, which was, as you know, right before the trial, as a

9    part of over 2,700 pages of materials.  It wasn't necessarily

10   separated from the other materials.  It was just in there.

11             In those materials, Kosuri admits to forging my

12   client's name on documents.  He admits -- he discusses -- in

13   August, during plea negotiations, the government sent me a

14   packet of documents --

15             THE COURT:  During whose plea negotiations?

16             MR. SIMMS:  Between my client and the government.

17             THE COURT:  All right.

18             MR. SIMMS:  They sent an e-mail that included several

19   e-mails and discussions and chats that showed that my client

20   had, in fact, incriminated himself and he should plead guilty.

21   One of those documents was a chat asking about pseudo names for

22   individuals working for EcomNets India, and he said that this

23   shows that there was deception as part of this scheme.

24             They questioned Mr. Kosuri about that during a

25   proffer which was provided.  That's one of the ones that was

524

1    provided last night in the notes, and he stated that those

2    pseudo names were simply for the EcomNets India employees that

3    worked at night that were making calls to western companies so

4    they would have more --

5                THE COURT:  Western-sounding names?

6                MR. SIMMS:  -- western-sounding names.

7                Not that it was part of the scheme, but it was just

8    basically, as at times I call Sprint, and it's clearly someone

9    in another country, and they're identifying themselves as John

10   Smith, and that wasn't provided to us.

11               And, Your Honor, in terms of -- and also, Mr. Kosuri,

12   we were provided this as part of *Jencks*, and I believe that

13   once again, it's *Giglio*, that when he was initially interviewed

14   after his arrest, his line was, "I just got bad legal advice."

15   You know, that was, that was the issue.  It was completely

16   based upon bad legal advice, where as far as in subsequent

17   proffers, he's stating otherwise, that he was actively involved

18   and he knew.

19               THE COURT:  So you're saying that Kosuri's statement

20   that he got bad legal advice was just revealed to you last

21   night or very recently?

22               MR. SIMMS:  That was, that was part of -- I believe

23   that may have been part of the *Jencks* material that was

24   received --

25               THE COURT:  Came in -- yeah.

525

1          MR. SIMMS:  The large amount of documents.

2          And once again, we were just swimming in documents

3     and trying to prepare for trial at the same time.

4          Your Honor -- and personally, and I know I've said

5     this before, I believe that this -- that these violations are

6     not -- it should never be taken lightly, but in this case,

7     where there's a record of e-mails between me and the government

8     where I'm pleading with them to provide these documents, and

9     then a response from the government, specifically Mr. Nitze,

10    saying that I'm well aware of my obligations under *Brady*,

11    *Giglio*, and *Jencks*.  If we come across *Brady*, we'll provide

12    them to defense counsel.

13         And this is after the July 15 interview.  This was a

14    response given to me in early October, after I had continuously

15    asked them for this information, and that was also before the

16    representation made by the government in court that of course

17    they would comply with their obligations to provide counsel

18    with *Brady* and *Giglio*.

19         Your Honor, it's scary that none of this would have

20    came out if you had not done that second inquiry before the

21    jury came out yesterday afternoon, because at the bench, they

22    stated that there were no notes, and then the Court decided to

23    inquiry just one more time on the record and to ask them

24    individually, and that's when this whole thing began to appear,

25    and it wouldn't have happened.  We would have just gone about,

1   those documents wouldn't have been disclosed, none of this

2   information would have been out there, and that's what makes it

3   so flagrant to me, Your Honor.

4            MR. STEWART:  Your Honor, just -- some of the other

5   issues that I was able to identify yesterday but not fully

6   develop are the inconsistency between the statements made by

7   Kaur and Narang and how those are absolutely material.

8            THE COURT:  Can you give me an example?

9            MR. STEWART:  Well, my initial reading of those two

10  statements seemed to indicate that there were inconsistencies

11  between who was signing documents fraudulently, and so you look

12  at Narang's statement, and she's saying one person was signing

13  these, you know, forging signatures, and then you look at

14  Kaur's statements, and it says that someone else was forging

15  signatures.

16           THE COURT:  Is that in this package, in the notes?

17           MR. STEWART:  Well, as they relate to --

18           THE COURT:  Let me go back.

19           MR. STEWART:  Again -- but the problem again is that

20  that's something that we're not able to fully develop, and so

21  one of the, one of the concerns that is discussed in *Brady*, and

22  it's especially in impeachment statements, are the cumulative

23  impeachment of -- well, I guess the cumulative effect of these

24  statements and their use in impeachment.  That is a defense

25  theory that takes more than 18 hours to develop.

1          And so it's -- and not -- and it may not be as

2     egregious as the offer of immunity and then the misstatement or

3     the lie by Narang, but it certainly has affected counsel's

4     ability to effectively prepare for trial.

5          THE COURT:  All right.  Does the government want to

6     respond?

7          MR. STEWART:  Your Honor, I did prepare some

8     arguments specifically that addresses when a violation has

9     occurred and what some of the potential remedies would be, and

10    also specifically with regard to the prejudice that -- the

11    multiple prejudices that defense counsel are currently

12    operating under and also how those all support a dismissal with

13    prejudice in this case.

14         I'm not sure if you want to hear from the government

15    or if you just want me to finish.

16         THE COURT:  Go ahead and finish.

17         MR. STEWART:  Yes, ma'am.  So as the Court is aware,

18    *Strickler v. Green* describes when a violation, a *Brady*

19    violation occurs, and there's basically three elements that are

20    laid out:  that there be evidence favorable to exculpation or

21    impeachment, clearly the case here with impeachment; the

22    evidence is either willfully or inadvertently withheld by the

23    prosecution, so there is no requirement of misconduct, that is

24    not a requirement; and that the withholding is prejudicial.

25         So Your Honor has identified that first element, that

528

1    there is clearly a violation -- or there's clearly evidence

2    that would tend to impeach.  And I think that at a minimum,

3    this evidence was inadvertently withheld by the prosecution.

4    On the other hand, we know that they've had this information

5    for a significant period of time, since July in one case,

6    August for the second Narang proffer, October 11 and 18 for the

7    last two.

8              So the -- we also know from looking at the case

9    law -- and I apologize, I had to pull cases from a number of

10   different circuits -- but prosecutorial bad faith is probative

11   of materiality as well as relevant in determining the remedy,

12   and so if the Court believes that the government had this

13   information and should have turned it over and didn't, then I

14   think that there's an element of bad faith there, and that is

15   relevant in determining what are ultimate requests as a remedy.

16             And I'm looking at a case out of the Third Circuit in

17   2005, I can't read my own handwriting, I believe it's

18   F-a-k-i-e.

19             Also, while materiality may not exist as a

20   prosecutorial defense -- I'm sorry, while materiality may exist

21   as a prosecutorial defense in a posttrial setting, it is not a

22   license to make materiality determinations pretrial.  And so

23   I'm not aware that there was a determination about materiality

24   and that's why it was or wasn't turned over, but in looking at

25   it now, it appears to be material, but that's not even the

529

1    standard at this point.

2            A *Brady* violation has been found because the

3    prosecution withheld material concerning a promise made to a

4    codefendant.  That's *Lacaze*, L-a-c-a-z-e, the Fifth Circuit in

5    2011, offer of immunity as a promise.  Violation because a

6    witness, previously undisclosed testimony transcripts, notes on

7    witness interviews, and an immunity agreement would have

8    impeached the prosecutor's crucial witness, and we had some

9    grand jury testimony, but we didn't have all the witness

10   interviews, we didn't have the immunity agreement.

11           THE COURT:  Wait, I'm sorry, you're saying you didn't

12   get all the grand jury testimony?

13           MR. STEWART:  We had grand jury testimony for Farmer,

14   Jones.  I don't believe that Narang was called in the grand

15   jury.  I don't believe that Kaur or Kosuri were used at the

16   grand jury.  So those were --

17           THE COURT:  Well, if they were and you didn't get

18   their transcripts, then that's absolutely --

19           MR. STEWART:  Well, I'm not -- and I'm not saying

20   that we didn't get transcripts.  I'm saying that I'm not aware

21   of whether or not they were used.  I don't believe that they

22   were.

23           But notwithstanding, witness interviews, and -- well,

24   specifically *Joseph v. Coyle*, C-o-y-l-e, out of the Sixth in

25   2006, also identifies notes on witness interviews and an

530

1    immunity agreement, and that is present in this case.

2            THE COURT:  All right.  Now, let's -- on this

3    immunity agreement, do you have at your fingertips what was

4    sent to you about immunity for Kaur?

5            MR. STEWART:  I received a letter yesterday.

6            THE COURT:  Can I -- we don't have it in print?

7            MR. STEWART:  I'm sure that I do but --

8            THE COURT:  I mean, I haven't entered an immunity

9    order, so it hasn't gone through the formal court process, so

10   this is -- okay.  All right.  So the letter is dated October

11   22.  Today is the 26th, right?

12           MR. STEWART:  So yesterday was the 25th.

13           THE COURT:  The 22nd, the 22nd was Friday?  It was

14   Saturday.

15           MR. STEWART:  And we were both available.  Both

16   counsel were hard at work.

17           Your Honor, the Eighth Circuit again in 2006 has also

18   mentioned the codefendant's statement is exculpatory because

19   it's relevant to the codefendant's role in the offense.  I

20   think in this case, there are statements made by Narang that

21   clearly illuminate what the purported role in the offense was

22   for both Mr. Jharia and Ms. Narang.

23           Also, *Cuffie*, D.C. '96, prior perjury could have

24   impeached a witness --

25           THE COURT:  Well, we don't have perjury here unless

1    somebody testified before the grand jury and -- well, all

2    right, let me hear from, let me hear -- I don't need to hear a

3    whole lot of cases on this.  I know what the law is on all

4    three of these things.

5            Mr. Nitze, let me hear from you.

6            MR. SIMMS:  Your Honor, I just want to finish a brief

7    point.

8            THE COURT:  All right.

9            MR. SIMMS:  Your Honor, in terms of prejudice to my

10   client, Mr. Jharia, Your Honor, things that we would have done

11   if we had known this information is we would have focused more

12   on Narang's e-mails.  There were over a million e-mails

13   supplied on a hard drive, and that's pretty much what counsel

14   was swimming through to get, get through discovery.

15           If we had, if we had known about that first session

16   and about her inconsistency between what she said initially and

17   what she subsequently said later on, the government may have

18   not known it, but I had the opportunity through counsel to

19   elicit certain questions from Raj Kosuri, which it was kind of

20   a -- his counsel played an in between, and I would have

21   certainly questioned him more so about Narang, which I didn't

22   ask him one question about her because we knew nothing about

23   what she was going to say or had no reason to even think about

24   her veracity.

25           We would have definitely interviewed her former

532

1    employer and employees of the Kosuri companies about Ms. Narang

2    in general, and once again, that would have went into the trial

3    prep.

4              Lastly, I would have been able to show these

5    documents and this information to my client so he can assist

6    counsel in preparing for trial.

7              THE COURT:  All right.

8              MR. STEWART:  Your Honor, these, these circumstances

9    have prejudiced us -- prejudiced both counsel in a number of

10   ways.  First, as we've discussed, the ability to meaningfully

11   prepare.  It's also -- and this is, relates to the remedy that

12   we're seeking -- we're prejudiced because the -- it affects the

13   ability of the witness to recall accurately, and we've

14   identified specifically with Ms. Narang statements where she

15   was interviewed in July and expressed uncertainty about a

16   signature and now she's testified about that same signature

17   with certainty.  And so we have a developing confirmation bias

18   in favor of the government with this witness.

19             So if the case is -- if there's a mistrial, the case

20   is set for February or March, then that confirmation bias with

21   this witness that we've been able to identify, we can only

22   presume that it's going to continue.

23             And additionally, we're prejudiced because the

24   government's heard our lines of questions -- our line of

25   questioning on eight witnesses more, and now if the case

1    were -- if a mistrial were declared and the retrial was set for

2    February or March, then the government will have an opportunity

3    to fill the holes that we've exposed in their case.

4            THE COURT:  Well, there are options besides

5    dismissal.  One would be to strike the testimony of Narang and

6    tell the jury they cannot consider any of that evidence.

7            MR. STEWART:  The only concern that I would have with

8    that is that even if -- I considered asking Your Honor to

9    strike testimony and also strike the exhibits.

10            THE COURT:  That were introduced through that

11    witness.

12            MR. STEWART:  Or even I would ask that exhibits that

13    she referenced would also be striked -- struck.

14            The problem with that is it leaves counsel in a very

15    similar situation with Kaur and potentially other witnesses

16    that are going to be testifying tomorrow or Thursday.  So

17    striking one witness doesn't fix the problem.  It also doesn't

18    change the fact that there's a *Brady* violation and an order

19    that the government has violated.

20            THE COURT:  All right.

21            MR. STEWART:  The other, the other prejudice is that

22    as a result of being inundated with the documents, some of it's

23    *Jencks*, technically they complied with it, but we've been

24    inundated with documents, and as Your Honor knows, we have --

25    we were approved for a limited budget for our paralegal.  In

534

1    order to get as prepared as we could, I've had to -- and we've

2    run out of time for that approval.  We got 200 hours; that's

3    gone.

4            Since October 20, whenever we were present in court,

5    I've had to use my paralegal to just help me get through all of

6    this, and she's helping me here today, and --

7            THE COURT:  Well, the budget is not an issue.  As you

8    know, we can always get that expanded.  So all right, let me

9    hear from the government.

10           All right, who's going to speak on behalf?

11   Mr. Nitze?

12           First of all, I want to make this record as clear as

13   possible:  Are there any grand jury records of any witness --

14   witnesses who were called to testify, are there any transcripts

15   that have not been turned over to the defense?

16           MR. NITZE:  No.

17           THE COURT:  You're positive?

18           MR. NITZE:  There are no grand jury transcripts of

19   any witnesses who have testified or will be called to testify

20   that have not been turned over to the defense.

21           THE COURT:  All right.  Now, the second thing is why

22   did you not alert the defense to the fact that Narang had lied

23   in her first debriefing?

24           MR. NITZE:  Your Honor, I can offer no excuse for

25   that, and I'm not here to excuse it or justify it.  Your Honor,

535

1   we -- the best answer I can give Your Honor today is that there

2   were no ROIs.

3          THE COURT:  But that's not the answer.  As a

4   prosecutor, you hear a witness who you're going to call in your

5   case, and the first line of questioning when confronted with an

6   issue that's relevant to the case, she lies, there's a

7   recognition of that, and it's written in the notes.

8          You were there.  You're listed as one of the

9   witnesses to that interview.  Why would you not have alerted

10  counsel that, you know, counsel, you should be aware that, you

11  know, in her first debriefing, whatever, Ms. Narang lied, she

12  then changed, you know, she admitted the lie, and she corrected

13  it?  Why would you -- why would you not do that?

14         MR. NITZE:  Your Honor, I don't know.  I -- Your

15  Honor, speaking for myself, I will simply say I did not prepare

16  to conduct the direct examination of Ms. Narang, and in the

17  frantic run-up to preparing for the trial, I did not review

18  Ms. Narang's notes of proffers in anticipation of the trial.

19         THE COURT:  Well, that's not a very good excuse.

20         MR. NITZE:  I understand, Your Honor.

21         THE COURT:  And why -- these, these questions and

22  answers that are in the package that was submitted, you-all

23  prepared -- you and your cocounsel prepared these?

24         MR. NITZE:  Those were prepared by

25  Ms. Fiorentino-Rios.  I did not prepare those.

536

1            THE COURT:  And then the answers that are indicated,

2    are those the answers given by the witness, or are they what

3    the government expected the witness to say?

4            MR. NITZE:  Your Honor, I shouldn't speak to that.

5            THE COURT:  All right.  So these are all from your

6    cocounsel.

7            MR. NITZE:  Correct.

8            THE COURT:  All right, Ms. Fiorentino-Rios, come up

9    to the lectern.

10            MS. FIORENTINO-RIOS:  Yes, Your Honor.  Those direct

11    outlines, which is what they should have been called, were

12    turned over in an abundance of caution, because I did prep

13    with -- well, they were turned over in an abundance of caution,

14    but the answers that you see there are a summary of what I

15    heard from these witnesses when I prepped with them and also

16    what I expected to hear from them.  So it's a combination of

17    both.

18            And I didn't edit it, if that, you know -- if I

19    didn't get that answer and I didn't have time to change it, I

20    just left it, but the questions are generally the outline I

21    used in trial, but because I had those notes, we thought it

22    would be best to turn them over prior to cross-examination of

23    Narang, and that decision was made yesterday.

24            THE COURT:  Ms. Martinez, I see that you're here.

25    Can you come up to the lectern for a second?

537

1      Ms. Martinez, does your office have a practice in

2  preparing witnesses to do Q&A's like this, where you actually

3  have the question written out and either what you hear the

4  witness say or your estimate of the witness's answer written

5  down?

6      MS. MARTINEZ:  I have not seen that practice used in

7  our office before, Your Honor.

8      THE COURT:  Yeah.  I haven't either, and that's why I

9  wanted to know, and I know you've been there a bit longer than

10  the two folks who are in court.  All right, thank you.

11      Well, I'm going to need to take this under

12  advisement.  I think these are very serious allegations.  It's

13  also, obviously, a serious case, and dismissal is a very

14  draconian result, but I think that this case -- if the Court's

15  discovery orders are supposed to mean anything, they mean that

16  the government will take them seriously and will completely

17  comply with them.

18      I am very concerned that there are certainly one or

19  two things here that are clearly *Brady*.  The fact that Narang,

20  who the jury has now heard several hours of her testimony, lied

21  and the defense was never advised about that, it certainly is

22  impeachable.

23      I think the fact that they got so much evidence at

24  the end of the day, now, you know, again, sometimes you look at

25  this stuff, my quick review, and it's a quick review, is that

538

1    much of it would be irrelevant, much of it is mostly

2    cumulative, some of it is clearly inculpatory, but there are

3    also things that I can see a defense attorney being able to use

4    to cross-examine witnesses.

5         I think the Q&A would be very significant in the eyes

6    of a jury because it looks like a script, and I think, you

7    know, again, the jury might draw no conclusions from that at

8    all, but I think it's problematic, and I think -- and I think

9    those would count as *Jencks* clearly, and so I think -- there's

10   one here for Farmer.  He's already testified.  And there are, I

11   think there are two or three in here.

12        So let me give these back to defense counsel because

13   it's the only set that we've got.  I do think for purposes of

14   the appellate record, I hate to do this to you, but you'll get

15   a -- I'll approach Judge Gregory if we have to get an expansion

16   on your budget.  I think there should be a full copy of this

17   package made for the record, all right?  You don't have to do

18   it today.

19        MR. NITZE:  Yes.

20        THE COURT:  I think the government should --

21        MR. NITZE:  Oh, Your Honor, we have a full copy of

22   the ROIs.

23        THE COURT:  What about, what about all of the, what I

24   call the handwritten notes, the second part of this?

25        MR. NITZE:  Your Honor, I will -- do not have a copy

539

 1   with me at the moment, but I can get a copy to the Court

 2   immediately.

 3           THE COURT:  All right.  Then we'll have that made

 4   part of the official record, and that gives me a chance in

 5   chambers to look at it even more carefully.

 6           MR. STEWART:  And, Your Honor, also, I would ask that

 7   the handwritten notes relating to Narang would also be

 8   provided.  We got three disclosures yesterday.  There's the

 9   Narang disclosure -- those are -- Narang we got immediately

10   after court; and then about three hours-ish later, we got the

11   handwritten notes; and then about two hours, two-and-a-half

12   hours after that, we got the batch of other stuff, including

13   the -- well, again, I'm not familiar enough with what's in each

14   batch to speak definitively about what was included in them.

15           THE COURT:  All right.  Well, I will spend some more

16   time in chambers going over what's in that batch.  At this

17   point, I'm taking the motion to dismiss the case entirely under

18   advisement.  I'm also considering whether a less draconian

19   sanction is appropriate.

20           Ms. Martinez has been here, I think, observing for

21   the U.S. Attorney.  I would expect that there'd be some

22   discussion back at your office as well as to what the

23   appropriate approach should be in this case.

24           Why don't I ask that you-all be back here at, say,

25   two this afternoon so that we can one way or the other resolve

1   what's pending.  So I deem this to have a pending motion to

2   dismiss on the docket and -- yeah.

3              MR. STEWART:  Your Honor, before you adjourn,

4   Mr. Simms wanted me to make one additional point.  It's

5   generally that the jury has already heard Ms. Narang's

6   testimony.

7              THE COURT:  I understand.

8              MR. STEWART:  So it would be very difficult to unring

9   that bell.

10             THE COURT:  I'm fully aware of that problem.

11             MR. SIMMS:  Yes, Your Honor.  As Your Honor heard,

12  she was the, thus far the most damaging witness for my client,

13  and she made several representations to the Court, at which

14  time -- and I looked at the jury and the effect that hearing

15  his name and her being the first person to implicate him in

16  this, their reactions, and they're looking towards him, Your

17  Honor.

18             So I would be under the impression that it's so

19  ingrained in their memory and in their thoughts that just

20  asking them to no longer abide by what they heard or to

21  disregard it, I don't believe is the necessary -- I don't

22  believe that that remedy is enough.

23             THE COURT:  Well, on the other hand, jurors were

24  having trouble hearing her, the Court was having trouble

25  hearing her, and quite frankly, my experience is with our

1    juries, that they listen to what the Court says.  If we tell

2    them to disregard a witness entirely, I have confidence they

3    can do that, especially if we strike any exhibits that were

4    introduced through that witness, but I agree with you, it gets

5    very complicated and difficult.

6            So I'm going to think very carefully about this.

7            MR. SIMMS:  Thank you.

8            THE COURT:  All right, we'll see you back here at two

9    o'clock.

10           (Recess from 10:40 a.m., until 2:00 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

542

```
 1              A F T E R N O O N   S E S S I O N

 2                    (Defendants present, Jury out.)

 3          THE COURT:  Just for the record, counsel, do you want

 4   to put your names on the record?

 5          MR. WIECHERING:  I'm Bob Wiechering for the United

 6   States, and I'd like to address the Court at the appropriate

 7   time.

 8          THE COURT:  You're the chief of the Criminal

 9   Division, Mr. Wiechering?

10          MR. WIECHERING:  Yes.

11          THE COURT:  All right.

12          MR. STEWART:  Good afternoon, Your Honor.  Andrew

13   Stewart on behalf of Ms. Bhattacharya.

14          MR. SIMMS:  Good morning, Your Honor.  Jonathan Simms

15   on behalf of Vikrant Jharia.

16          THE COURT:  All right.  Mr. Wiechering, as you know,

17   this matter comes before the Court on the defendants' motion to

18   dismiss.

19          MR. WIECHERING:  Your Honor, regrettably, I have to

20   say that the government cannot say at this point with any

21   confidence that we've met our discovery obligations in this

22   case, and I apologize to the Court for that.  Accordingly, the

23   government would seek a mistrial in this matter, and that would

24   allow the government to appoint new counsel to the matter to

25   review it to determine whether we would go forward or have some
```

543

1   other appropriate disposition and, I would assure the Court, to

2   absolutely guarantee that we would meet our discovery

3   obligations going forward in this case.

4           THE COURT:  Mr. Wiechering, I know this was a

5   difficult assignment for you, and it was certainly not

6   something the Court was happy to see happen.  As I've told my

7   law clerks, many times we learn more from mistakes that are

8   made than from things that we do correctly, and I must tell you

9   that this case was fraught with a lot of problems, and we might

10  as well just put it on the record.

11          First of all, as you know, the judges in this court

12  have for a long time felt that there should be a permanent line

13  assistant assigned to every criminal case.  That apparently was

14  not done here, so we had two although long-term, nevertheless

15  special assistants who just don't have the type of experience

16  that a regular assistant has, and I hope that that will not

17  happen again.

18          The second thing that concerns me a little bit is

19  actually I started to spend more time looking at the original

20  indictment, the superseding indictment, and I'm sure that you

21  know that there was actually at the last minute a motion filed

22  by the government to correct the superseding indictment, and

23  quite frankly, because defense counsel were so generous,

24  you-all might not have looked as carefully at that, I certainly

25  didn't since it was an unobjected motion, but I went back over

544

1    the recess and started to look at the original indictment

2    compared to the current one, and there are some interesting

3    questions.  I may not require answers, but I just throw these

4    out because they did give me concern.

5           In the original indictment, Count 1 was a 371

6    conspiracy, which exposed those defendants in that count, that

7    includes these two, to five-year exposure.  The superseding

8    indictment ratcheted that up to a conspiracy to commit wire

9    fraud, which has a 20-year exposure.

10          And if you look at the allegations in those two first

11   counts, they're almost all -- I mean, obviously, the original

12   indictment had some SBA and other issues in it, so if anything,

13   that was maybe more serious conduct.  Now, of course, Kosuri

14   was in the case at that point.

15          But it makes me wonder why you would change the

16   exposure for defendants unless you were somehow trying to

17   punish them for exercising their rights not to plead guilty to

18   go to trial.  That just concerned me.  Defense counsel never

19   raised it, and I don't fault you for it because you-all were

20   struggling with an awful lot of discovery, but it gives me a

21   little bit of concern.

22          Then there was an issue about -- and, of course, what

23   had happened was the government in the superseding indictment

24   mislabeled the counts.  So, you know, we all make typographical

25   errors.  But then in that same motion, there was a request to

545

1    change the caption for Counts 2 through 4, and Counts 2 through

2    4 have in one of the captions the H-1B visa, and the government

3    in their motion was asking to have that changed to a different

4    type of visa, but if you look at the allegations in the

5    indictment, they discussed Jharia as having an L-1A visa, and

6    the caption they wanted changed was to an L-1/H-1B.  I mean, it

7    didn't even make any sense, the correction, they wanted for

8    that.

9           And then in the, in the forfeiture count, they had

10   alleged the wrong, the wrong conspiracy.

11          I suggest that you-all might want to look at the

12   minutes from the grand jury proceeding to see how that grand

13   jury was instructed about the elements and the basis upon which

14   that superseding indictment was even issued.  But I was very

15   concerned as I spent some more time looking at the indictment.

16   That alone began giving me some concerns.

17          I also was quite surprised -- and I'm glad that

18   Mr. Boente is here as well -- I can't believe that this is

19   correct, but in one of the notes that I saw, it looked as

20   though it was Mr. Nitze was telling I think it was Narang that

21   they could do a courtroom run-through on Saturday,

22   October 15.

23          Does your office think you have access to our

24   courtrooms when we're closed so that you can have witnesses

25   rehearse here?

546

1          MR. WIECHERING:   I've never heard of that, Your

2    Honor.

3          THE COURT:   And maybe what was intended was the

4    witness would do a run-through in your space, but the word

5    "courtroom" is in those notes, which gave me concern.   I want

6    to make sure that nobody thinks they can do that.

7          MR. WIECHERING:   I would be shocked by that, Your

8    Honor.

9          THE COURT:   All right, all right.

10         In terms of the awful litany then, I don't need to go

11   through it.   I have for the record found that there was clearly

12   at least one *Brady* violation, that there was definitely a

13   *Giglio* violation, and that the failure to provide adequate

14   discovery, among other things, for example, there's a very

15   interested ROI in just the package you gave me this morning

16   about an attorney named Khosla who the agents believe may have

17   signed both Kosuri and codefendants' names to these documents.

18   I mean, that's clearly relevant evidence, that the defense

19   attorney is hearing that other people might be signing

20   codefendants' names, which could include their own.

21         So I am granting the motion for the mistrial.   I am

22   dismissing this case.

23         Now, the next question is, I mean, all of these

24   errors were caused by the government and, frankly, not by the

25   agents from what I could tell.   Everything we've talked about,

547

1     the *Brady* and the discovery problems, come from the

2     prosecutors.

3               Whether it's with or without prejudice is always the

4     next question, all right?  And usually where the basis for the

5     mistrial is caused by the government, I don't think you get a

6     chance to bring those exact same charges against these

7     defendants.  So I think the defense counsel have a right to

8     address this issue as to whether the dismissal should be with

9     or without prejudice.

10              MR. WIECHERING:  I think that's appropriate under

11    26.03, Your Honor.  I would ask the Court, and I'll address the

12    issues as best I can, I know there's been some argument on

13    their part about prejudice, you know, in terms of dismissal

14    without prejudice in terms of a retrial.  I'm probably not in

15    the best position to address some of those issues.  I haven't

16    seen any of the trial.  I know the Court's in a better

17    position, frankly, but if the Court --

18              THE COURT:  Ms. Martinez has been.  I'm sorry, there

19    is one other thing, as long as we're using this as a learning

20    experience, and, Ms. Martinez, I'll not ask you to respond to

21    this, but just you can go back to your office and talk about

22    it:  The opening statement in this case came close to resulting

23    in the Court if not dismissing the case, questioning whether

24    they should go forward, because it was not until the last two

25    or three minutes that either defendant's names got mentioned.

548

1            Now, it may be because the prosecutors were so

2     focused on Mr. Kosuri, who clearly was the lead defendant in

3     this case and the mastermind of this operation, that they were

4     having trouble shifting gears to focusing on two

5     lesser-included people, but it was surprising to me.  The

6     elements were not clearly spelled out for this jury.  It was a

7     very strange opening statement.

8            And I have in the past, not recently, had defense

9     attorneys jump up and ask for a case to be dismissed on the

10    basis of the government's opening statement not, you know,

11    adequately showing that we're going to address the issues in

12    this case.  You-all were gentlemen; you didn't do it; and

13    frankly, the law would not result in my doing it, so that was

14    probably a good tactical decision on your part; but it struck

15    me; and I made a note of that in my notes on this case.  So

16    that's just one more thing.

17           MR. WIECHERING:  But if it would assist the Court,

18    Your Honor, we'd be happy to brief the issues.  We'd just ask

19    for time to do that if the Court feels that's appropriate.

20           THE COURT:  In this case, I think there's been enough

21    time spent on this case.  I've had to go to Chief Judge Gregory

22    to get greatly extended budgets for both of these CJA

23    attorneys.  I think this case needs to be finished.  There may

24    be other charges that wouldn't have a jeopardy issue.  I mean,

25    that's something that you-all can discuss down the road, but in

549

1    terms of this case with these specific charges, I'm granting

2    the motion to dismiss with prejudice, and the defendants will

3    be released from their bond obligations as of today.

4                 MR. WIECHERING:   Thank you.

5                 THE COURT:   All right, we'll alert the jury.   We'll

6    recess court for the day.

7                               (Which were all the proceedings

8                                had at this time.)

9

10                   CERTIFICATE OF THE REPORTER

11        I certify that the foregoing is a correct transcript of

12   the record of proceedings in the above-entitled matter.

13

14

15                          _____
                                      /s/
16                             Anneliese J. Thomson

17

18

19

20

21

22

23

24

25